UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>        v.<br><br>GREGOIRE P. TOURNANT,<br>TREVOR L. TAYLOR, and<br>STEPHEN G. BOND-NELSON,<br><br>                              Defendants. | No. 1:22-cv-4016<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

### SUMMARY

1.      This case arises from a multibillion-dollar fraud perpetrated by Defendants Gregoire P. Tournant ("Tournant"), Trevor L. Taylor ("Taylor"), and Stephen G. Bond-Nelson ("Bond-Nelson") (together, "Defendants"), while they were employed by Allianz Global Investors U.S. LLC ("AGI US").  Defendants' fraud involved numerous material misrepresentations and other deceptive conduct related to AGI US's Structured Alpha funds, which were private funds sold to investors.

2.      Structured Alpha was a complex options trading strategy designed to generate profits by using a portfolio of debt or equity securities as collateral to purchase and sell options, principally on the S&P 500 Index.  AGI US marketed and sold at least 17 Structured Alpha funds to approximately 114 institutional investors.  As of December 2019, the Structured Alpha funds held approximately $11 billion in assets under management.

3.     Tournant was the Lead Portfolio Manager for the Structured Alpha funds, and he led the portfolio management team.  Taylor and Bond-Nelson also worked on the portfolio management team and helped manage the Structured Alpha funds.

4.     From at least January 2016 through March 2020 ("Relevant Period"), AGI US and Defendants materially misled investors about the significant downside risks of Structured Alpha.  As detailed below, Defendants manipulated numerous financial reports and other information provided to investors in order to conceal the magnitude of Structured Alpha's true risk and the funds' actual performance.

5.     Tournant engaged in additional misconduct.  First, he materially misrepresented to investors the levels at which hedging positions were put in place for the Structured Alpha funds.  Second, Tournant caused the portfolio management team not to implement a risk mitigation program agreed to with Structured Alpha's largest investor ("Client A"), and then, to hide that failure and increase his own compensation, Tournant manipulated certain reports provided to AGI US and Client A regarding the risk mitigation program.  Third, Tournant misrepresented to investors that Structured Alpha had a capacity limit of $9 billion for certain funds when, in fact, Tournant caused that limit to be exceeded by more than $3 billion.

6.     The Structured Alpha funds performed relatively well until the Covid-related market volatility in March 2020, when they suffered catastrophic losses, including losses in excess of 90% in certain funds.  Investors lost billions of dollars.  Those investors included pension funds for teachers, clergy, bus drivers, engineers and others, the vast majority of whom live and work in the United States.

7.     Investors in the Structured Alpha funds trusted that AGI US and Defendants would manage their assets in accordance with the fiduciary duties of an investment adviser, and

investors believed that the information AGI US and Defendants provided was accurate and complete in all material respects.  But AGI US and Defendants misled investors and betrayed their trust.  While Defendants profited from their deception – each of them received millions of dollars in bonuses during the Relevant Period – investors suffered massive losses.

8.      After March 2020, when the market dropped, Defendants engaged in multiple efforts to conceal their misconduct from the SEC.  For example, Tournant urged Bond-Nelson to provide false testimony to SEC investigators, and Tournant met with Taylor at a vacant construction site and discussed reports they had manipulated and how to respond to government investigators' questions.

9.      But Defendants' attempts to hide their fraud were not successful.  After initially being untruthful with the SEC staff about various documents that he altered, and refusing to complete his investigative testimony, Bond-Nelson decided to cooperate and assist the staff.  Soon after Bond-Nelson's testimony, Taylor likewise cooperated with the staff investigating the Structured Alpha fraud.

10.      By engaging in the conduct described herein, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2); and Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

11.      Unless restrained and enjoined, Defendants are likely to violate these securities laws in the future.

## DEFENDANTS

12.     **Gregoire P. Tournant**, age 55, is a resident of Miami, Florida.  Tournant served

as the Chief Investment Officer ("CIO") of the U.S. Structured Products Group for AGI US and

was the Lead Portfolio Manager for the Structured Alpha funds.  Tournant also served on the

U.S. Executive Committee of AGI US.  At all relevant times, Tournant served as an investment

adviser to the Structured Alpha funds because, for compensation through salary and bonuses, he

advised the Structured Alpha funds, and investors in those funds, about investing in, purchasing,

and selling securities.  Tournant holds Series 3, 7, 24, and 30 securities licenses.

13.     **Trevor L. Taylor**, age 50, is a resident of Miami, Florida.  Taylor was a

Managing Director at AGI US and served as Co-Lead Portfolio Manager of the Structured Alpha

funds.  Taylor assisted Tournant in managing the Structured Alpha funds.

14.     **Stephen G. Bond-Nelson**, age 51, is a resident of Berkeley Heights, New Jersey.

Bond-Nelson was a Managing Director at AGI US and served as Portfolio Manager for the

Structured Alpha funds.  Bond-Nelson also assisted Tournant in managing the Structured Alpha

funds.  Bond-Nelson holds Series 7 and 63 securities licenses.

## RELEVANT ENTITY AND FUNDS

15.     **Allianz Global Investors U.S. LLC**, a Delaware limited liability company

headquartered in New York, New York, is an investment adviser registered with the

Commission.  As of December 31, 2020, AGI US managed $148.8 billion in client assets.   At all

relevant times, AGI US served as an investment adviser to the Structured Alpha funds because,

for compensation in the form of performance fees, AGI US advised the funds about investing in,

purchasing, and selling securities.

4

16.     **The Structured Alpha funds**, as used herein, are the following funds that AGI US and Defendants offered and sold to investors during the Relevant Period:  (1) AllianzGI Structured Alpha U.S. Equity 500 LLC; (2) AllianzGI Structured Alpha U.S. Equity 250 LLC; (3) AllianzGI Structured Alpha Large Cap Equity 350 L.P.; (4) AllianzGI Structured Alpha Global Equity 500 LLC; (5) AllianzGI Structured Alpha Global Equity 350 LLC; (6) AllianzGI Structured Alpha Emerging Markets Equity 350 LLC; (7) AllianzGI Structured Alpha 1000 LLC; (8) AllianzGI Structured Alpha 1000 Plus LLC; (9) AllianzGI Structured Alpha 1000 Plus Ltd.; (10) AllianzGI Structured Alpha 500 LLC; (11) Allianz SAS; (12) AllianzGI Structured Alpha U.S. Fixed Income 250 LLC; (13) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Fixed Income Series; (14) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Large Cap Series; (15) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Small Cap Series; (16) AllianzGI Structured Alpha Multi-Beta Series LLC I – International Equity Series; and (17) AllianzGI Structured Alpha Multi-Beta Series LLC I – US Long Credit Series.  At all relevant times, the Structured Alpha funds were pooled investment vehicles within the meaning of Rule 206(4)-8 of the Advisers Act, 17 C.F.R. § 275.206(4)-8, and interests in the Structured Alpha funds were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and Section 202(a)(18) of the Advisers Act, 15 U.S.C. § 80b-2(a)(18).

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a); Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa; and Sections 209(d) and 214(a) of the Advisers Act, 15 U.S.C. §§ 80b-9(d) and 80b-14(a).

18.     The Court has personal jurisdiction over Defendants, and venue is proper in this judicial district, because many of the acts and transactions constituting violations of the Securities Act, Exchange Act, and Advisers Act occurred in this district.  For example, as alleged herein, Defendants made material misrepresentations to investors during in-person meetings in New York City and in telephone or other electronic communications directed to investors located in this district.  One or more investors in the Structured Alpha funds had their principal places of business within this district, at which they received material misrepresentations from Defendants.  Additionally, Bond-Nelson worked in AGI US's office in New York City, from which he made at least some of the material misrepresentations alleged herein.

19.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means and instruments of transportation or communication in interstate commerce, or the mails, including soliciting investors located in other states and obtaining funds from those investors through wire transfers in interstate commerce.

**FACTS**

**I.     The Structured Alpha Strategy and Portfolio Management Team**

20.     Structured Alpha provided investors with exposure to a variety of debt or equity securities (the "beta" component) coupled with a complex options trading strategy designed to generate additional profits (the "alpha" target).  Investors could choose among various combinations of beta components and alpha targets.  For example, AllianzGI Structured Alpha U.S. Equity 500 LLC provided exposure to the S&P 500 Index with an alpha target of 5% per year, while the AllianzGI Structured Alpha 1000 LLC fund provided exposure to 90-day Treasury Bills with an alpha target of 10% per year.

6

21.     Structured Alpha's options trading strategy had three components:  range-bound spreads, directional spreads, and hedging positions.  Range-bound spreads and directional spreads were designed to generate profits by collecting premiums from selling put and call options that expired out-of-the-money ("OTM").[1]  Hedging positions were designed to protect against short-term market crashes.

22.     At all relevant times, Tournant led the Structured Alpha portfolio management team, which included Tournant, Taylor, and Bond-Nelson.  Tournant managed the Structured Alpha funds by, among other things, setting the levels at which hedging positions were put in place, controlling the content of information given to investors, and determining compensation for other members of the team, including Taylor and Bond-Nelson.  All Defendants, as members of the portfolio management team, had significant discretion over the Structured Alpha funds.

23.     Throughout the Relevant Period, all actions by Defendants alleged herein were taken within the course and scope of their employment with AGI US.

## II.     Tournant and AGI US Made Material Misrepresentations Regarding the Hedging Positions of the Structured Alpha Funds

24.     In offering and selling the Structured Alpha funds during the Relevant Period, Tournant showed various marketing materials to investors, including pitch books purporting to describe the Structured Alpha strategy and how the funds would be managed.  One key aspect of how the funds would be managed involved hedging positions consisting of put options, which were sometimes referred to by AGI US personnel as "tail risk hedges" or "TRHs."  Hedging

---

[1] A call option is a contract that gives the buyer the right to buy shares of an underlying security at the strike price for a specified period of time.  A put option is a contract that gives the buyer the right to sell shares of an underlying security at the strike price for a specified period of time.  A call option is OTM if the strike price is above the actual security price, and a put option is OTM if the strike price is below the actual stock price.  *See generally* Investor Bulletin: An Introduction to Options (Mar. 18, 2015), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_introductionoptions.html.

positions were important to investors because they were supposed to protect investors in the event of a market downturn.

25.     In the marketing materials for the Structured Alpha funds, AGI US and Tournant materially misrepresented to investors the levels at which Structured Alpha's hedging positions were put in place.  For example, in a pitch book slide for Structured Alpha that Tournant showed to investors repeatedly from at least November 2016 through March 2020, Tournant and AGI US represented that hedging positions included put options that were "laddered for various market outcomes to the downside" with "*[s]trike distances from -10% to -25%*."  (Emphasis added.) The slide explained that "[t]he primary objective of the hedging positions is to protect the strategy from a short-term equity market crash," which was "[d]efined as a decline of 10% to 15% in less than 5 days."  A copy of the slide is shown below:



26.     But contrary to the representations in the marketing slide – which Tournant disseminated and repeated to multiple investors – strike prices for TRHs often were *not* laddered

within the range of -10% to -25% during the Relevant Period.  Indeed, beginning around

February 2018, strike prices averaged from -30% to -50% OTM, as illustrated below:



27.     Instead of laddering TRHs with strike distances from -10% to -25%, as

represented to investors, the portfolio management team, at Tournant's direction, generally

purchased cheaper put options with significantly lower strike prices.  And those lower strike

prices provided less protection to investors in the event of a short-term market drop.

28.     Tournant reviewed and approved the misleading pitch book slide shown above.

For example, on or around October 12, 2016, an AGI US employee sent an email to other AGI

US employees containing edits to the Structured Alpha pitch book slides "based on our

discussions with Greg [Tournant]."  The edits included the following language for the pitch

book:  "The puts are laddered for various market outcomes to the downside," and "Strike

distances are laddered from -10% to -25%."  With Tournant's knowledge, the misrepresentation

regarding strike distances from -10% to -25% was incorporated into AGI US's standard

Structured Alpha pitch book no later than November 15, 2016.

29.     As the leader of the portfolio management team, Tournant knew, or was reckless in not knowing, the actual hedging positions of the Structured Alpha funds.  Tournant thus knew, or was reckless in not knowing, that AGI US's marketing materials – including the pitch book slide shown above – contained material misrepresentations regarding hedging positions.

30.     Nevertheless, from at least November 2016 through March 2020, Tournant and other members of the portfolio management team repeatedly used the misleading materials in meetings and other communications to offer and sell Structured Alpha to investors.  For example, Tournant, or Taylor or Bond-Nelson acting at Tournant's direction, shared the misleading marketing materials with investors on or about April 28, 2017, June 25, 2019, and July 11, 2019, all at AGI US's office in New York City.

31.     On March 16, 2020, during the Covid-related market volatility, Bond-Nelson informed an AGI US colleague of the actual strike prices for the TRHs; the colleague replied, "*TRH 22% to 55% OTM.  Jesus,*" indicating that the true hedging levels were inconsistent with what had been told to investors.  (Emphasis added.)  Also around March 2020, Taylor acknowledged to Bond-Nelson that the actual hedging levels of the Structured Alpha funds were further OTM than what was represented to investors in AGI US's marketing materials.

## III.     Defendants Manipulated Reports and Other Information Provided to Investors Regarding the Structured Alpha Funds

32.     During the Relevant Period, Defendants manipulated numerous reports and other information provided to investors.  As described below, the reports and information that Defendants materially manipulated included:  (1) risk reports prepared by an AGI US affiliate, IDS GmbH ("IDS Risk Reports"), (2) daily performance data, (3) so-called "Greeks," which are measures of risk, (4) attribution spreadsheets, (5) expected value ("EV") sheets, and (6) open position data.  Defendants' manipulations described herein had no basis in fact.  Further,

Defendants' manipulations misled investors by concealing the true risk and performance of the Structured Alpha funds, and the fact that the portfolio management team was dishonest.

**A.      IDS Risk Reports**

33.      IDS Risk Reports contained various stress test results that modeled the impact of changes in the market on the Structured Alpha funds.  Certain investors requested copies of IDS Risk Reports from AGI US and relied upon those reports in assessing the downside risk of the strategy.  The IDS Risk Reports were important to investors in the Structured Alpha funds because they helped investors understand the risk to their investments and assess whether they should remain invested in Structured Alpha or take their investments out of the funds.

34.      As described below, from at least March 2018 through January 2020, while acting at Tournant's direction, Bond-Nelson manipulated numerous IDS Risk Reports sent to investors in order to conceal the true downside risk of Structured Alpha.  Investors, however, did not know that the reports they received were altered.

35.      Bond-Nelson sent the manipulated versions of IDS Risk Reports that he created to AGI US Product Specialists, typically in emails with the subject line "monthlies."  AGI US Product Specialists then forwarded those materials to AGI US distribution personnel (or AGI US employees in similar roles), who forwarded the materials to Structured Alpha investors.

36.      Bond-Nelson's material alterations of the IDS Risk Reports had no basis in fact and were designed to create the false appearance of lower downside risk for investors.

*Month-End February 2018 IDS Risk Report*

37.      On March 1, 2018, Defendants received the month-end February 2018 IDS Risk Report for Structured Alpha.  On March 5, 2018, Bond-Nelson forwarded a manipulated version of that report to AGI US's Structured Alpha Product Specialists for dissemination to investors.

11

38.     Specifically, for the AllianzGI Structured Alpha 1000 LLC fund, in one instance, Bond-Nelson materially reduced losses in a stress scenario from -22.0557450847078% to -12.0557450847078%.  Bond-Nelson made similar material alterations to the outputs of stress test scenarios for the AllianzGI Structured Alpha 500 LLC fund, the AllianzGI Structured Alpha U.S. Equity 500 LLC fund, and the AllianzGI Structured Alpha Global Equity 350 LLC fund.

39.     By making these alterations, which had no basis in fact, Bond-Nelson concealed the true risk of the funds.  As a result, the report sent to investors was materially misleading.

### Month-End March 2018 IDS Risk Report

40.     On April 3, 2018, Defendants received the month-end March 2018 IDS Risk Report for Structured Alpha.  On April 4, 2018, Bond-Nelson sent an email to two AGI US Structured Alpha Product Specialists, with the subject line, "Hold off on sending any month end reports," stating:  "Need to check something with GT," meaning Gregoire Tournant.  Later that day, on April 4, 2018, Bond-Nelson forwarded to the Product Specialists a manipulated version of the March 2018 IDS Risk Report, which he had altered.

41.     Specifically, Bond-Nelson altered the outputs of stress test scenarios for the AllianzGI Structured Alpha 1000 LLC fund: one entry from -24.5987389395798% to -12.2993694697899%, and another from -30.8197078741882% to -15.4098539370941%.  These altered amounts were exactly one-half of the actual IDS stress test outputs and had no basis in fact.  The effect of these alterations was to create the false impression that the fund was less risky than it was in fact.  As a result, the report sent to investors was materially misleading.

### Manipulation of IDS Report Data in May 2018

42.     Tournant also manipulated IDS Risk Report data by manually altering stress test results.  For example, on or around March 15, 2018, an AGI US Product Specialist sent an email

to Tournant that included historic stress test data from IDS Risk Reports. Tournant then manipulated that data, and, on May 18, 2018, emailed the altered data to the Product Specialist, stating: "See attached – you can use this one."

43.     In manipulating the data, Tournant changed over 150 entries in the IDS Risk Report data series. For example, in one alteration, Tournant reduced the losses of an IDS stress test output from -42.1505489755747% to -4.1505489755747% (i.e., he removed one digit). In making these alterations, Tournant reduced the variability in losses and gains as follows:

| Scenario (equity / volatility) | -20% / 300% scenario | -20% / 200% scenario | -10% / 300% scenario | -10% / 200% scenario | -10% / 100% scenario |
|---|---|---|---|---|---|
| Actual maximum losses | -90.58% | -98.00% | -31.32% | -33.88% | -37.76% |
| Altered maximum losses | -8.64% | -18.03% | -5.32% | -10.56% | -18.98% |
| Actual, maximum gains | 62.49% | 27.33% | 50.84% | 20.36% | -4.49% |
| Altered maximum gains | 16.87% | 0.20% | 4.73% | -2.44% | -9.49% |

44.     Tournant's intentional or reckless alterations of data had no basis in fact and were designed to create the false appearance of lower downside risk for investors.

45.     On May 18, 2018, the AGI US Product Specialist emailed to an investor the materially misleading IDS stress test data that Tournant altered.

### Manipulation of Additional Risk Reports from June 2018 to January 2020

46.     From June 2018 through January 2020, Bond-Nelson continued to manipulate IDS Risk Reports before they were sent to investors in substantially the same manner outlined

above – i.e., by manually altering entries in the reports to make the Structured Alpha funds appear materially less risky than they were in fact.

47.     Throughout the Relevant Period, Bond-Nelson materially altered IDS Risk Reports sent to investors for the following Structured Alpha funds:  AllianzGI Structured Alpha 1000 LLC; AllianzGI Structured Alpha 1000 Plus LLC; AllianzGI Structured Alpha 500 LLC; AllianzGI Structured Alpha U.S. Equity 500 LLC; AllianzGI Structured Alpha Global Equity 500 LLC; and AllianzGI Structured Alpha Global Equity 350 LLC.

48.     During the Relevant Period, Bond-Nelson, acting at Tournant's direction or with Tournant's knowledge, made more than 200 alterations to data in IDS Risk Reports and caused at least 87 materially altered IDS Risk Reports to be sent to investors or prospective investors. Bond-Nelson and Tournant knew, or were reckless in not knowing, that manipulating the IDS Risk Reports made those reports materially misleading.

49.     After the Covid-related market drop around March 2020, and before learning of the SEC's investigation, Bond-Nelson expressed concern to a Structured Alpha Product Specialist that he might face serious consequences for altering the risk reports.

50.     Tournant and Bond-Nelson obtained money from investors by means of the materially misleading risk reports.  As alleged herein, Defendants' misrepresentations led to investments in the Structured Alpha funds.  AGI US earned performance fees from the Structured Alpha funds, and a portion of those fees went to Defendants.  Thus, the amounts paid to Defendants were generally higher with greater amounts of assets under management.

51.     Additionally, investments were made by investors following the receipt of altered risk reports.  For example, on July 23, 2019, in connection with due diligence for deciding whether to invest in the AllianzGI Structured Alpha U.S. Equity 500 LLC fund, a representative

from a U.S. institutional investor requested risk reports from AGI US.  On July 24, 2019, a representative from AGI US responded by email, stating: "Please refer to the attached risk report," and attaching the month-end June 2019 risk reports that had been materially altered, and thus rendered false and misleading, by Bond-Nelson in at least six stress test results.  On or around August 30, 2019, after receiving the altered risk reports, the investor purchased $330 million of shares in the AllianzGI Structured Alpha U.S. Equity 500 LLC fund.

52.     Other investors increased their investments in Structured Alpha funds after receiving manipulated IDS Risk Reports.  For example, one U.S. institutional investor received risk reports for the AllianzGI Structured Alpha 1000 LLC fund on a monthly basis, from at least the month-end October 2017 risk report through the February 2020 risk report.  During that time, the investor received multiple AllianzGI Structured Alpha 1000 LLC risk reports that were altered, and thus rendered false and misleading, by Bond-Nelson.  Following the receipt of several manipulated risk reports, in May 2019, that investor increased its investment in AllianzGI Structured Alpha 1000 LLC by $50 million.

**B.     Daily Performance Data**

53.     Some investors requested daily performance data to understand how Structured Alpha performed historically during periods of market stress.  Tournant and Bond-Nelson responded to these requests by falsifying – or "smoothing" – actual daily performance data for certain dates before sending the data to investors.  Smoothing daily performance data concealed from investors the true downside risk and volatility of Structured Alpha, and thus made the data materially false and misleading.

*June / July 2016 Structured Alpha 1000 Plus Smoothed Performance Data*

54.    In June 2016, a prospective investor asked AGI US to provide daily returns for AllianzGI Structured Alpha 1000 Plus since its inception in August 2012.  After receiving that request, a Product Specialist forwarded the daily returns to Tournant in a spreadsheet and asked, "Are you comfortable with us sending this externally to [the investor]?"

55.    On July 2, 2016, Tournant sent a version of the spreadsheet back to the Product Specialists, stating, "See attached – you can send this file to [the investor]."  But Tournant had manipulated the performance data on the spreadsheet to "smooth" the returns.  Tournant's alterations to the daily performance data had no basis in fact and rendered the data materially false and misleading.

56.    For example, Tournant altered the returns for August 20, 2015 through August 31, 2015, as follows:

| Date | Return (Gross of fees) | Return Altered by Tournant | Difference |
|---|---|---|---|
| August 20, 2015 | -3.38764791658818 | -1.38764791658818 | +2% |
| August 21, 2015 | -5.42035375667693 | -3.42035375667693 | +2% |
| August 24, 2015 | -18.2607085709004 | -9.2607085709004 | +9% |
| August 25, 2015 | 5.35176329960697 | 1.35176329960697 | -4% |
| August 26, 2015 | 8.37147093860846 | 1.27147093860846 | -7.1% |
| August 27, 2015 | 3.39933596785672 | 1.29933596785672 | -2.1% |
| August 28, 2015 | 0.703163407972238 | 0.203163407972238 | -0.5% |
| August 31, 2015 | 0.171816106022435 | 0.071816106022435 | -.0.1% |

57.    On July 4, 2016, an AGI US Product Specialist sent the spreadsheet, as altered by Tournant, to the investor.  The spreadsheet purported to show actual returns, but was materially misleading because Tournant's manipulated data concealed the fund's true performance.  The

investor, unaware of the manipulation, later invested $16 million in AllianzGI Structured Alpha 1000 Plus Ltd. in or around December 2016.

### *October 2016 Structured Alpha 250 Smoothed Performance Data*

58.     In September 2016, a U.S. consulting firm was considering whether to invest in the AllianzGI Structured Alpha U.S. Equity 250 LLC fund.  On or about September 30, 2016, a representative for the consulting firm requested daily performance data from an AGI US Structured Alpha Product Specialist.

59.     In connection with that request, on October 7, 2016, Tournant sent a spreadsheet to the Product Specialist.  The spreadsheet purported to show daily performance data for the fund at issue but, in fact, Tournant had manipulated the data by "smoothing" the returns.  These alterations to the daily performance data had no basis in fact, and thus made the data materially false and misleading.

60.     Specifically, Tournant reduced certain losses on the spreadsheet, including the dates with the highest losses from 2010 forward.  Tournant manipulated 95 entries on the spreadsheet (29 in 2010, 44 in 2011, 2 in 2012, 13 in 2014, and 7 in 2015).  In one alteration, for example, Defendant Tournant reduced the losses for August 8, 2011 from -15.8613360141283% to -10.8613360141283%.

61.     On October 7, 2016, a Structured Alpha Product Specialist sent the spreadsheet altered by Tournant to a representative of the investor consulting firm.  The spreadsheet purported to show actual daily returns, but was materially misleading because Tournant manipulated the data to conceal the fund's true performance.

### May 2019 Structured Alpha 1000 Plus Smoothed Performance Data

62.     On May 15, 2019, a Structured Alpha Product Specialist emailed Tournant regarding another request to send daily returns to a prospective investor.  The Product Specialist attached a spreadsheet containing AllianzGI Structured Alpha 1000 Plus daily returns.

63.     That same day, May 15, 2019, Tournant sent a version of the spreadsheet back to the Product Specialist, writing:  "Daily returns: you can use this."  But Tournant had manually manipulated the performance data on the spreadsheet – again "smoothing" the returns.  His alterations to the daily performance data had no basis in fact, and thus made them materially false and misleading.  For example, Tournant reduced losses for August 24, 2015 from -12.78% to -7.78%.  On May 15, 2019, the materially false and misleading returns were forwarded to the relationship manager affiliated with AGI US and then emailed to the prospective investor.

### March 2020 Structured Alpha 1000 Plus Smoothed Performance Data

64.     On March 2, 2020, in the midst of the Covid-related market volatility, a family office investor in the AllianzGI Structured Alpha 1000 Plus Ltd. fund wrote an email to AGI US Structured Alpha Product Specialists, requesting "the strategy's daily returns since inception."

65.     Later that day, in connection with the investor's request for information, Bond-Nelson forwarded to a Product Specialist an email that he had sent to Tournant on January 15, 2020, attaching the spreadsheet called "Allianz Global Investors Structured Alpha 500 – Daily Returns Sept 2005 – December 2019.xlsx."  Bond-Nelson knew that the performance data on the spreadsheet had been materially altered, or "smoothed," at Tournant's direction, and was thus materially false and misleading.

66.     On March 3, 2020, a Structured Alpha Product Specialist sent an email to other Product Specialists, referencing prior communications with the family office investor and stating:  "OK, just found this.  *We definitely sent smoothed numbers.*"  (Emphasis added.)

67.     On the evening of March 3, 2020, the lead Product Specialist had dinner at a restaurant in Miami, Florida with Tournant.  Tournant and the lead Product Specialist discussed the investor's request for performance data.  Tournant, who knew or was reckless in not knowing that the performance data from Bond-Nelson had been manipulated and was materially false and misleading, nevertheless directed the lead Product Specialist to send the manipulated information to the investor.

68.     Later same evening, March 3, based on the instructions from Tournant, the lead Product Specialist emailed to a representative of the family office investor the spreadsheet "Allianz Structured Alpha 500 Daily Returns Sept 2005 – February 2020.xlsx," which contained the materially false and misleading "smoothed" daily returns for the AllianzGI Structured Alpha 500 LLC fund prepared by Bond-Nelson.

**C.     Greeks**

69.     In the options industry, the term "Greeks" refers to measures of risk associated with options positions.  Options traders and investors rely on Greeks – including delta, gamma, vega, and theta positions – when making investment decisions.  Delta, which is sometimes referred to as "net delta" or "net exposure," is a measure of the sensitivity of an option position to a change in the underlying asset.  Greeks are important in assessing the risk associated with investments, and certain Structured Alpha investors periodically requested them.

70.     As described below, during the Relevant Period, Tournant and Bond-Nelson manipulated Greeks provided to certain investors, principally by lowering deltas, which made the

19

Greeks materially false and misleading. During the Relevant Period, Tournant intentionally or recklessly altered at least 44 Greeks reports that were sent to investors, and Bond-Nelson intentionally or recklessly altered at least 15 Greeks reports that were sent to investors.

71. Bond-Nelson sent the manipulated versions of Greeks that he created to AGI US Product Specialists, sometimes in the same emails containing manipulated IDS Risk Reports (i.e., with the subject line "monthlies"). As with the IDS Risk Reports, AGI US Product Specialists forwarded those materials to AGI US distribution personnel or relationship managers, who sent those materials to Structured Alpha investors.

72. Bond-Nelson and Tournant knew that investors considered the net delta metric to be important in assessing the risk of the Structured Alpha funds. On September 28, 2016, in response to a question from an investor regarding portfolio leverage, Bond-Nelson stated that the Structured Alpha portfolio management team monitored net delta exposure, which they viewed as "*the most explanatory*" metric regarding "sensitivity to market moves." (Emphasis added.)

### *July 2017 Manipulation of Financial Crisis Greeks*

73. On July 20, 2017, at the request of a prospective U.S. institutional investor, Tournant emailed Bond-Nelson a table with historic Greeks for September 30, 2008 and October 31, 2008 – a period of heightened volatility during the 2008 Financial Crisis that was relevant to the investor in assessing the downside risk of Structured Alpha.

74. But Tournant had materially altered the historic Greek information in the table by reducing the "Gross Long" and "Net exposure" (i.e., net delta) by 20% for September 30, 2008. Specifically, Tournant, acting knowingly or recklessly, reduced "Gross Long" from 129.76% to 109.76%, which had the effect of reducing "Net exposure" from 61.07% to 41.07%. These

20

alterations had no basis in fact and made the figures materially false and misleading.  Tournant then emailed the information to Bond-Nelson to be compiled for the investor.

75.     On July 21, 2017, Bond-Nelson emailed the materially manipulated Greeks data to Tournant and a Structured Alpha Products Specialist.  That Products Specialist then forwarded the manipulated data to the AGI US relationship manager for the investor, who emailed it to the investor on July 24, 2017.

76.     After receiving the manipulated Greeks, in July 2018, the investor entered into a subscription agreement to invest $150 million in the AllianzGI Structured Alpha Large Cap Equity 350 L.P. fund.

### *Manipulation of Q3 2017 Daily Greeks*

77.     On October 11, 2017, Tournant sent to a Structured Alpha Product Specialist an email with the subject "Attribution and Greeks for [an institutional investor]."  The email attached a spreadsheet created by Tournant called "AGI SA 500 Daily Greeks Q3 2017.xlsx."

78.     In the spreadsheet, Tournant had materially manipulated daily Greeks for the dates with the five highest net deltas – August 10, 2017, August 11, 2017, August 17, 2017, August 18, 2017, and August 21, 2017 – by reducing the "Gross Long (%)" and "Net Delta (%)" by 10%.  Those alterations had no basis in fact.  Further, Tournant knew, or was reckless in not knowing, that the manipulated data was materially false and misleading and that it would be sent to an investor.

79.     On October 13, 2017, the altered spreadsheet was emailed to the relationship manager affiliated with AGI US, who sent the manipulated Greeks data to the institutional investor on October 26, 2017.

*Manipulation of February 2018 Greeks*

80.     On April 10, 2018, Bond-Nelson sent Tournant an email attaching a spreadsheet,

"SA 500 Daily Greeks Q1 2018.xlsx," which listed Greeks for the first quarter of 2018.

81.     On or around April 11, 2018, Bond-Nelson and Tournant discussed the

spreadsheet.  That same day, April 11, Bond-Nelson sent a revised version of the spreadsheet to

Structured Alpha Product Specialists.  In the revised spreadsheet, at Tournant's direction, Bond-

Nelson had reduced the gross long, gross short, and net delta figures for February 8, 2018 – the

date with the highest net delta.  As a result, the net delta dropped from its actual value of

112.42321916134% to a false value of 89.938575330507%.  This manipulation of data had no

basis in fact.  Further, Bond-Nelson and Tournant knew, or were reckless in not knowing, that

the manipulated data was materially false and misleading and that it would be sent to an investor.

82.     On April 11, 2018, a Products Specialist sent the manipulated daily Greeks data to

the relationship manager affiliated with AGI US, for distribution to the investor.

83.     Tournant also altered net deltas for February 2018.  On February 14, 2018,

Tournant by email requested that members of the Structured Alpha portfolio management team

provide him with data "to develop some bullet points/slides on how last week's move [i.e., the

market volatility in early February 2018] compares with Aug 2011-Aug 2015."  Later that day,

in response to Tournant's request, an AGI US employee emailed Tournant a file called "SPX

10&30 day Historical Vols and Greeks.xlsx."

84.     Tournant then manipulated entries on the "Historical Greeks" tab for the

AllianzGI Structured Alpha 500 LLC fund.  Specifically, he lowered the February 8, 2018 net

delta value from 112.423219163134% to 72.423219163134% – a reduction of 50%.  Tournant

also reduced the net delta for February 9, 2018, from 63.4216821006926% to

53.4216821006926% – a reduction of 10%.  Tournant knew, or was reckless in not knowing, that his reductions had no basis in fact and rendered the data materially false and misleading.

85.     On February 26, 2018, Tournant asked an AGI US employee to print his manipulated Greeks spreadsheet so that it could be used at meeting with investors.

### *Manipulation of December 2018 Greeks*

86.     On January 7, 2019, Bond-Nelson sent Tournant an email attaching a file, "SA 500 Daily Greeks Q4 2018.xlsx," which listed daily Greeks for the fourth quarter of 2018, including gross long, gross short, net delta, gamma, vega, and theta.

87.     Later that day, Bond-Nelson sent a revised version of the file to Tournant.  In the revised file, at Tournant's direction, Bond-Nelson had materially manipulated certain daily Greeks, including gross long and net delta, to reduce the appearance of downside risk during December 2018.  Bond-Nelson manipulated at least the following Greeks:

**Actual Greeks**

| Date | Gross Long (%) | Gross Short (%) | Net Delta (%) |
|---|---|---|---|
| 12/21/2018 | 133.99% | -39.03% | 94.96% |
| 12/24/2018 | 165.21% | -40.55% | 124.66% |
| 12/26/2018 | 115.00% | -31.40% | 83.60% |
| 12/27/2018 | 118.02% | -31.08% | 86.95% |
| 12/28/2018 | 103.88% | -22.27% | 81.62% |
| 12/31/2018 | 83.76% | -9.07% | 74.69% |

**Greeks Altered by Bond-Nelson**

| Date | Gross Long (%) | Gross Short (%) | Net Delta (%) |
|---|---|---|---|
| 12/21/2018 | 120.99% | -39.03% | 81.96% |
| 12/24/2018 | 140.21% | -40.55% | 99.66% |
| 12/26/2018 | 84.00% | -31.40% | 52.60% |
| 12/27/2018 | 82.02% | -31.08% | 50.95% |
| 12/28/2018 | 66.88% | -22.27% | 44.62% |
| 12/31/2018 | 46.76% | -9.07% | 37.69% |

88.     Upon receipt of the altered file, on January 8, 2019, Tournant replied by email: "Great thanks."  Tournant and Bond-Nelson knew, or were reckless in not knowing, that the manipulated figures had no basis in fact and were materially false and misleading.

89.     On January 14, 2019, Bond-Nelson emailed the materially altered Greeks file to Structured Alpha Product Specialists, so that it could be sent to an institutional investor.  On January 18, 2019, a relationship manager affiliated with AGI US emailed the altered Greeks file to the institutional investor.

90.     Certain investors purchased interests in Structured Alpha funds after receiving materially manipulated Greeks.  For example, as described above, an institutional investor made a $150 million investment in the AllianzGI Structured Alpha Large Cap Equity 350 L.P. fund in July 2018, after receiving manipulated Greeks.

91.     Other investors increased their investments following the receipt of materially altered Greeks.  For example, in December 2019, an institutional investor who received Greeks altered by Bond-Nelson, at Tournant's direction, increased its investment in the Allianz SAS fund by more than $100 million.

### D.     Attribution Spreadsheets

92.     Attribution spreadsheets were designed to inform investors about gains and losses attributed to the three prongs of the Structured Alpha strategy:  range-bound spreads, directional spreads, and hedging positions.

93.     Tournant was primarily responsible for creating attribution data that was shared with investors, and he did so with little or no substantive oversight or review.  As Tournant acknowledged in a March 5, 2018 email to an AGI US employee, "In the team, I work on all these attributions."

94.     As described below, during the Relevant Period, Tournant knowingly or recklessly manipulated multiple attribution spreadsheets to mislead investors about the amounts spent on hedging positions.

### *Manipulation of Attribution Spreadsheets in October 2017*

95.     On or around August 29, 2017, an institutional investor in the Allianz SAS fund asked AGI US to provide "[r]eturn and risk broken down by the three sub-strategies, and in turn broken down for the type of option / financial instrument."  The investor wanted to receive the information by October 13, 2017.

96.     On October 13, 2017, in connection with the investor's request, Tournant prepared an attribution spreadsheet called "SA 500 Realized-Unrealized Detailed Attribution Q3 2017.xlsx."  In the spreadsheet, Tournant manipulated certain hedging data to misrepresent the amount of money the portfolio management team was spending on hedging positions.  For example, Tournant manipulated the following hedging data:

| Date | Actual | Altered by Tournant | Difference |
|---|---|---|---|
| July 2017 | -.023291582278481 | -.133291582278481 | 11 basis points |
| August 2017 | -.025635805907173 | -.125635805907173 | 10 basis points |
| September 2017 | -.037074345991561 | -.127074345991561 | 9 basis points |

97.     Monthly hedging loss figures were important to investors.  Because tail risk hedges typically expired worthless and OTM, investors viewed hedging losses as a proxy for the amount spent on hedging in a typical month without market stress.  The actual hedging data above showed that the amount spent by the portfolio management team on hedging was less than what was described in the Structured Alpha marketing materials.  So, Tournant materially altered certain amounts to conceal the truth from investors.

98.     Tournant altered numerous other entries in the spreadsheet in a similar manner. For example, Tournant materially altered the "Short Term Directional Puts" data for July 2017, August 2017, and September 2017, by manipulating digits to conceal the true amounts from investors.  Tournant knew, or was reckless in not knowing, that his manipulated figures were materially false and misleading.

99.     On or about October 26, 2017, with Tournant's knowledge, a relationship manager affiliated with AGI US emailed Tournant's materially altered spreadsheet to an institutional investor.

### *Manipulation of Attribution Spreadsheets in January 2018*

100.     In the next quarter, Tournant sent additional falsified attribution data to the same institutional investor who received the manipulated data on or around October 26, 2017.

101.     On January 16, 2018, Tournant sent to Structured Alpha Products Specialists an attribution spreadsheet called "SA 500 Realized-Unrealized Detailed Attribution Q4 2017," which he had manipulated.  Specifically, Tournant knowingly or recklessly fabricated the "Tail Hedging Indices" for October, November, and December of 2017, without any factual basis, making the figures materially false and misleading.

102.     On January 16, 2018, with Tournant's knowledge, a Structured Alpha Product Specialist forwarded the Q4 2017 attribution spreadsheet containing the falsified figures to the relationship manager affiliated with AGI US, who emailed it to the investor.

### *Manipulation of Attribution Spreadsheets for June to September 2019*

103.     In subsequent quarters, Tournant prepared additional attribution spreadsheets that contained similarly falsified data.  For example, for June 2019, July 2019, and September 2019, Tournant knowingly or recklessly prepared attribution spreadsheets that contained "Tail Hedging

26

Indices" of -.1244868768 – i.e., the exact same amount – which was not accurate or based in fact.  These attribution spreadsheets prepared by Tournant were thus materially false and misleading.

104.    In December 2019, after receiving several quarters of attribution data falsified by Tournant (and falsified Greeks, as described above), an institutional investor increased its investment by more than $100 million in the Allianz SAS fund.

### Falsified "Hedging Statistical Distances" in Attribution Spreadsheets in January 2020

105.    As described above, the pitch books for marketing Structured Alpha falsely represented that long puts for hedging would be "laddered for various market outcomes to the downside" with "[s]trike distances from -10% to -25%."  This range of strike distances was important to investors who wanted to ensure their investments were adequately protected in the event of a market downturn.

106.    In furtherance of that material misstatement, Tournant fabricated ranges for "Hedging Statistical Distances" in attribution spreadsheets.  The Hedging Statistical Distances in the attribution spreadsheets that Tournant prepared were consistent with the range of hedging strike distances represented in the pitch book.  In reality, however, the actual Hedging Statistical Distances were significantly further OTM than the ranges shown in the attribution spreadsheets.

107.    For example, on or about January 8, 2020, Tournant emailed to Structured Alpha Product Specialists multiple attribution spreadsheets for investors, including the file "AGI SA 350 Detailed Attribution as of Dec 31, 2019," which Tournant had knowingly or recklessly created using falsified data.  That attribution spreadsheet showed "Hedging Statistical Distances" to be -10% to -23% for October 2019; -12% to -25% for November 2019; and -12% to -24% for

December 2019.  In fact, however, the actual Hedging Statistical Distances were significantly further OTM – approximately -20% to -40% or further.

108.    On or about January 15, 2020, with Tournant's knowledge, an AGI US employee emailed the falsified attribution data to a representative of a prospective institutional investor.

### E.    EV Sheets

109.    EV sheets calculated expected values – gains and losses – in the Structured Alpha funds under various market conditions.  EV sheets were shown to certain investors to demonstrate the sophistication of the Structured Alpha portfolio management team's investment methodology and risk mitigation techniques.  And EV sheets were important to investors because they helped investors assess the risk in their portfolios.

110.    During the Relevant Period, as detailed below, Tournant and Taylor manipulated EV sheets shown to certain investors to conceal the actual downside risk of the Structured Alpha funds.  Taylor manipulated EV sheets at Tournant's direction.

### *Manipulation of EV Sheets for a July 19, 2017 Meeting with a Prospective Institutional Investor*

111.    In July 2017, an institutional investor was conducting due diligence for a potential investment in the AllianzGI Structured Alpha 1000 LLC fund.  Tournant planned to meet with the prospective investor on July 19, 2017.

112.    On the morning of July 19, 2017, Tournant created a spreadsheet that showed actual EV data for the AllianzGI Structured Alpha 1000 LLC fund.  Tournant then manipulated the data to materially increase the gains and decrease the losses, making the data materially false and misleading.  Specifically, Tournant multiplied the gains by 1.4 (increasing the gains), and the losses by .25 (reducing the losses).  He then emailed the altered spreadsheet to another AGI US

employee for use in the investor meeting.  Tournant's alterations of the EV sheet data had no

basis in fact and concealed AllianzGI Structured Alpha 1000 LLC's true downside risks.

113.    On July 19, 2017, Tournant attended the investor meeting, which took place in

New York City.  During the meeting, Tournant provided a demonstration that included the

expected payoffs and other risk modeling based on the figures Tournant had manipulated.

114.    About one month later, on or around August 14, 2017, the prospective investor

informed AGI US that it would invest in Structured Alpha.  The institutional investor made its

first $50 million investment in AllianzGI Structured Alpha 1000 LLC in October 2017.

### *Taylor Instructed Tournant on How to Manipulate EV Sheets*

115.    Manipulation of EV sheets was labor-intensive.  So, on August 5, 2017, Taylor

emailed Tournant password-protected, step-by-step instructions on how to alter data and avoid

detection by investors.  Among other things, the instructions specified:  "3) On a blank sheet in

that workbook, copy and paste the ENTIRE EV SHEET THEREBY DUPLICATING IT

EXACTLY."  Then, after copying the data from the actual EV Sheet, the instructions specified to

create new manipulated figures:  "7) On the new sheet target appropriate EV's and simply apply

formulas you desire and copy up or down."  The "formulas" created falsified numbers by

multiplying amounts on the actual EV sheet to reduce the magnitude of expected losses.

116.    The instructions further described hiding the actual EV sheet output from

investors:  "If you believe the investor will not ask you to toggle to another portfolio (like

SA1000 or Plus) – copy, paste special value the sheet so its [sic] fixed, *hide the original EV sheet*

and your [sic] done."  (Emphasis added.)

117.    Taylor's instructions also discussed concealing from investors the formulas

showing altered EV outputs:  "*During a presentation, I would not put the mouse over any cells*

*that are populated thereby showing its formula unless [you] did a copy paste special value.*"
(Emphasis and alteration added.)

### Taylor's August 2017 Manipulation of an EV Sheet

118.     On August 6, 2017, the day after Taylor sent Tournant instructions on how to alter
EV sheets, Taylor sent Tournant a file that he created, "EV Sheets 1.xlsx."  In that file, Taylor
altered an actual EV sheet and created a new EV sheet, with falsified numbers, for an investor
meeting.  For example, for more than ten entries, Taylor multiplied the actual potential losses by
.15 to lessen, or minimize, the apparent downside of the investment strategy.  Among other
things, Taylor materially changed the maximum potential losses from the actual figure of
$4,786,991, to $718,049.

119.     Taylor's alterations to the EV sheet had no basis in fact and Taylor knew, or was
reckless in not knowing, that his alterations made the document materially false and misleading.

### Taylor's December 2018 Manipulation of an EV Sheet

120.     On or around November 15, 2018, Taylor was invited to a meeting at AGI US's
office in New York City with a representative of a prospective institutional investor for
Structured Alpha.

121.     On December 1, 2018, in preparation for the investor meeting, Taylor emailed
himself a spreadsheet that he created, "EV Sheets 1 (version 1).xlsb."  As before, Taylor
manipulated the actual EV sheet data in the spreadsheet to create falsified figures.  For example,
for more than 20 entries, Taylor multiplied the actual potential losses by .2 to reduce the losses.
Among other things, Taylor materially changed the maximum potential losses from the actual
figure of $2,343,502, to $468,700.

122.    Taylor's alterations to the EV sheet had no basis in fact and Taylor knew, or was reckless in not knowing, that his alterations made the document materially false and misleading.

123.    Two days after creating the manipulated EV sheet, on December 3, 2018, Taylor met with representatives from the prospective institutional investor at AGI US in New York City and reviewed, among other things, the manipulated EV sheets data.

124.    On August 30, 2019, the investor purchased $330 million of shares in the AllianzGI Structured Alpha U.S. Equity 500 LLC fund.

**F.    Open Positions Data**

125.    Open positions data showed investment positions in the Structured Alpha funds. This data was created for certain investors during the demonstration portion of meetings.

126.    Open positions data was important to investors in assessing portfolio risk because, among other things, the data reflected how far OTM hedges (i.e., long puts) were, and thus the extent to which Structured Alpha funds were hedged.

127.    Tournant and Taylor knew that the actual TRHs for the Structured Alpha funds were often not in the -10% to -25% range represented to investors in the Structured Alpha marketing materials described above.  Therefore, Tournant and Taylor – acting at Tournant's direction – altered certain open position data spreadsheets to change the strike prices on TRHs and conceal the truth from investors.  Those alterations had no basis in fact and made the spreadsheets materially false and misleading.

*Manipulation of an Open Positions Data Spreadsheet for a Prospective Institutional Investor in January 2019*

128.    On January 17, 2019, in Paris, France, Tournant met with representatives of an institutional investor that was considering investing in the AllianzGI Structured Alpha U.S. Equity 250 LLC fund.

129.    On January 28, 2019, Tournant sent an email to an AGI salesperson, to be forwarded to the prospective institutional investor as a follow-up to the earlier meeting. Tournant attached to that email several open positions data spreadsheets that he had manipulated without any factual basis.   Specifically, Tournant had materially altered the spreadsheets by increasing the strike prices for long put positions that made up the tail risk hedges, which had the effect of making the tail risk hedges appear closer to the spot price than they were in fact.

130.    On one of the spreadsheets alone, Tournant made 75 alterations to the strike prices of SPX tail risk hedge long puts.  Tournant increased the strike prices in amounts from $400 to $700 to show that the long puts were closer to in-the-money than they were in fact.

131.    Additionally, for six Russell 2000 index (or "RUT") long put positions, Tournant raised the strike price from $1,000 to $1,250, which created the false impressions that the strike prices were less OTM than they were in fact, and that the strike prices were closer to the ranges represented to investors in the Structured Alpha marketing materials.

132.    On January 29, 2019, an AGI salesperson informed Tournant and others that he had sent Tournant's open positions data to the French institutional investor.  The investor did not know that the open positions data was materially altered from the actual numbers.

### *Taylor's July 2019 Manipulation of Open Positions Data*

133.    On or around July 10, 2019, Taylor manipulated open positions data. Specifically, in open positions data prepared for an investor meeting, Taylor increased strike prices on TRHs from $1,625 to $2,225, thus reducing strike distances from -45.01% to -24.71% OTM.

134.    Taylor's knowing or reckless manipulation of data was designed to conceal the fact that TRHs were out of the range represented to investors in the Structured Alpha marketing materials.

**IV.    Tournant Materially Misrepresented Information about Variable Alpha Targets**

**A.    AGI US Agreed to a Risk Mitigation Program that Included Variable Alpha Targets for the Largest Investor in Structured Alpha**

135.    During the Relevant Period, Structured Alpha's largest investor ("Client A"), was an ERISA plan administrator.  Client A invested in five different fund series of AllianzGI Structured Alpha Multi-Beta Series LLC I, which was a "fund of one" – meaning there was only one investor in the fund (Client A).

136.    In connection with this investment, on May 1, 2014, Client A and AGI US entered into an Amended and Restated Investment Side Agreement, which specified certain obligations that AGI US owed to Client A.  Among other things, the agreement provided that AGI US was "empowered to exercise full discretion in the management of the investment transactions [for Client A], subject only to any restrictions set forth in the Fund Documents."

137.    After investing in AllianzGI Structured Alpha Multi-Beta Series LLC I, Client A developed concerns over the downside risk of Structured Alpha and considered reducing its exposure or exiting the strategy.  But Client A stayed invested after Tournant spoke to Client A's CIO in late 2015, and proposed a risk mitigation program to allay Client A's concerns.

138.    In January 2016, AGI US and Client A executed an Investment Strategy Amendment, pursuant to which AGI US agreed to adjust alpha targets according to the level of the CBOE Volatility Index ("VIX").  VIX represents a market expectation for volatility and is a measure of risk, fear, or stress in the market.

139.    The details of AGI US's agreement with Client A changed over time, but the agreement was in place for the duration of the Relevant Period.  Tournant became aware of each amendment to the agreement around the time it was executed.

140.    The variable alpha targets agreed upon between Client A and AGI US are illustrated in the chart below.  For example, in 2019, if the VIX were less than 15, the alpha target would be between 2.5% and 4% (i.e., between 250 and 400 basis points); and if the VIX were greater than 30, the alpha target would be between 6.5% and 9% (i.e., between 650 and 900 basis points).

| Date | Equity Funds | | Fixed Income Funds | |
|---|---|---|---|---|
| | *VIX Level* | *Alpha Target* | *VIX Level* | *Alpha Target* |
| ***January 2016 - August 2016*** | <15 | 450-500 | <15 | 450-500 |
| | 15-20 | 500 | 15-20 | 500 |
| | 20-25 | 600 | 20-25 | 600 |
| | 25-30 | 700 | 25-30 | 700 |
| | >30 | 750 – 1000 | >30 | 750 - 1000 |
| ***September 2016 – December 2018*** | Same variable alpha targets as for January 2016 – August 2016 | | 750 fixed alpha target | |
| ***January 2019 – March 2020*** | *VIX Level* | *Alpha Target* | *VIX Level* | *Alpha Target* |
| | <15 | 250-400 | <15 | 250-400 |
| | 15-20 | 350-550 | 15-20 | 350-550 |
| | 20-25 | 450-650 | 20-25 | 450-650 |
| | 25-30 | 550-800 | 25-30 | 550-800 |
| | >30 | 650-900 | >30 | 650-900 |

**B.    Tournant Caused the Portfolio Management Team Not to Implement the Risk Mitigation Program**

141.    Within AGI US, Tournant was responsible for implementing the risk mitigation program and ensuring that Client A's capital was invested in accordance with the parties' agreement.  But during most of the Relevant Period, Tournant caused the portfolio management team not to consistently implement the risk mitigation program for Client A's investment.

142.    Under Tournant's leadership, and at his direction, the Structured Alpha portfolio management team deviated from its agreed-upon investment strategy for Client A by consistently using alpha targets well above the targets represented to Client A.  Tournant knew, or was reckless in not knowing, about these deviations.  Indeed, Tournant created spreadsheets that showed the difference between (i) the agreed-upon alpha targets, which he labeled "Grid Agreed," and (ii) how the AllianzGI Structured Alpha Multi-Beta Series LLC I funds were actually being managed, which he labeled "Grid Actual":

| Grid Actual | | Grid Agreed | |
|---|---|---|---|
| VIX | Net Alpha | VIX | Net Alpha |
| <15 | 550 | <15 | 450-500 |
| 15 to 20 | 650 | 15 to 20 | 500 |
| 20 to 25 | 750 | 20 to 25 | 600 |
| 25 to 30 | 800 | 25 to 30 | 700 |
| > 30 | 800-1000 | > 30 | 750-1000 |

143.    Tournant was responsible for providing the appropriate alpha targets to use for Client A.  But as Tournant knew, or was reckless in not knowing, the discrepancy between the "Grid Actual" and the "Grid Agreed" worsened through 2018.  By mid-2018, rather than use any grid for purposes of determining alpha targets, Tournant caused the Structured Alpha portfolio management team generally to use a more aggressive alpha target of 750.

144.     Under Tournant's leadership and direction, the Structured Alpha portfolio management team never abided by the agreement to use the alpha targets agreed-upon with Client A.  Rather, unknown to Client A, the portfolio management team used materially different alpha targets.

C.     **Tournant Falsified Alpha Target Data**

145.     To conceal his misconduct, Tournant knowingly or recklessly provided Client A with written reports that materially misrepresented the alpha targets used by the Structure Alpha portfolio management team.  As described below, Tournant also provided the same false and misleading information to AGI US in order to increase his compensation.

146.     Specifically, Tournant created "[Client A] Variable Alpha Target Analysis" spreadsheets that purported to show the daily alpha targets used for the Structured Alpha Multi-Beta Series LLC funds.  Tournant shared these spreadsheets at meetings with the CIO of Client A, including meetings that Tournant attended around, among other dates, March 24, 2017, September 8, 2017, and January 24, 2018.

147.     The spreadsheets purported to show that the Structured Alpha portfolio management used alpha targets for the AllianzGI Structured Alpha Multi-Beta Series LLC I funds that were consistent with the alpha targets agreed upon by Client A.  In fact, as Tournant knew or was reckless in not knowing, the alpha targets that Tournant listed on the spreadsheets were false and materially understated the risk of the AllianzGI Structured Alpha Multi-Beta Series LLC I funds.

148.     Beginning no later than October 2016, Tournant sent versions of the variable alpha target spreadsheet data on a quarterly basis to a member of the human resources group at AGI US.  On April 25, 2019, a member of the performance group at AGI US requested the

36

variable alpha target spreadsheet data by email, writing: "Finance has asked that we produce the revenue sharing file monthly going forward therefore I will likely need this data after each month-end."  As requested, on April 29, 2019, and on a monthly basis thereafter through January 2020, Tournant emailed that individual updated versions of his variable alpha target spreadsheet.

149.    The variable alpha target data that Tournant created, some of which was shared with Client A and AGI US, contained materially falsified alpha target information.  The graph below compares the actual alpha targets for the AllianzGI Structured Alpha Multi-Beta Series LLC I fund with equity beta components, against the falsified alpha targets created by Tournant:



150.    As reflected in the graph, actual alpha targets for funds with equity beta components typically were 40% to 50% above the levels reported by Tournant in 2018 and 2019.  Thus, Tournant knowingly or recklessly concealed the truth about how Client A's investments were managed.

### D. Tournant's Alpha Target Misrepresentations Increased Compensation to AGI US and Tournant

151.    Tournant's material misrepresentations regarding alpha targets for Client A resulted in increased compensation to both AGI US and Tournant.

152.    AGI US's compensation for the investments of Client A was set at 30% of the alpha – the amount above the pertinent benchmark for each Structured Alpha fund.  Higher alpha target funds took on more market risk and targeted higher alpha return by selling more options to obtain higher premiums.  Obtaining higher alpha returns earned AGI US higher compensation.

153.    AGI US's Structured Products Group, of which Tournant was the CIO, earned a higher revenue share as returns approached or exceeded stated alpha targets.  In addition to sharing falsified alpha targets with Client A, Tournant also provided falsified alpha target spreadsheets internally to AGI US for purposes of determining the applicable revenue share for the Structured Products Group.  By providing understated alpha targets internally, Tournant increased the Structured Products Group's revenue share.

154.    Tournant knew that lower alpha targets for the Client A funds meant higher compensation for the Structured Products Group.  For example, in a February 3, 2018 email, Tournant wrote to the AGI US Accounting & Financial Management group that they had "incorrectly calculated the Rev Share %" for the Client A funds.  In support of that assertion, he attached tables showing understated average alpha targets for the Client A funds.  Tournant forwarded the email internally to colleagues in the Structured Products Group, stating that his recalculation was "[w]orth about 900K to our Comp pool."

155.    Tournant personally received approximately one-third of the Structured Product Group's revenue share.  Thus, by falsifying alpha target data, Tournant improperly inflated his own personal compensation.

**V.      Tournant Made Material Misrepresentations about Capacity Limits for the Structured Alpha Funds and Caused the Funds to Breach Their Capacity Limits**

**A.      AGI US and Tournant Misrepresented the Capacity Limits for Certain Structured Alpha Funds**

156.    From at least July 2017 through March 2020, AGI US and Tournant misrepresented to investors – through pitch books and investor presentations – that Structured Alpha funds with alpha targets of 500 and above had a capacity limit of $9 billion.  In fact, unknown to investors, AGI US exceeded the purported capacity limit.

157.    As described below, capacity utilization was determined by multiplying the amount of assets under management in a particular fund by the specific "multiplier" designated for that fund.

158.    Capacity limits were important to investors because they did not want the Structured Alpha funds to become too large, which might negatively impact returns.  Investors understood that capacity limits were in place to ensure that, in times of market stress, the options trades would not further decrease returns by impacting markets or moving underlying market indices.  For example, the U.S. institutional investor that invested $330 million in AllianzGI Structured Alpha U.S. Equity 500 LLC in August 2019 considered it important that the portfolio management team "monitor[ed] the capacity of each versions [*sic*] of the strategy closely."

159.    But AGI US and Tournant misled investors about capacity limits.  For example, on September 11, 2018, a Structured Alpha Products Specialist emailed an AllianzGI Structured Alpha U.S. Equity 250 LLC pitch book to an investor consultant, copying Tournant and others, and stating:  "As follow up to today's meeting, please find attached the presentation that the team referred to as promised."  As shown below, the presentation contained a pitch book slide

representing that Structured Alpha funds with alpha targets of 500 and greater had "Total

Capacity" of $9 billion and were "CLOSED":



160.    Another slide, which was typical of Structured Alpha pitch books, greyed out

Structured Alpha funds with alpha targets of 500 and above and stated:  "*Grey text represents

strategies that are not open to new investments*."  (Emphasis added.)

161.    In fact, AGI US did not adhere to the $9 billon capacity limit or close funds when

the limit was breached.  As of December 2019, the actual capacity utilization for Structured

Alpha funds with alpha targets of 500 and above exceeded $12 billion:



### B.   Tournant Repeatedly Permitted Investments in Structured Alpha Funds in Excess of the Purported Capacity Limit

162.    Tournant knew, or was reckless in not knowing, that Structured Alpha funds with alpha targets of 500 and greater exceeded the $9 billion capacity limit.  During the Relevant Period, Tournant regularly received from AGI US personnel capacity utilization spreadsheets and other reports, which showed actual capacity utilization and that the funds exceeded their purported capacity limit.

163.    Nevertheless, Tournant approved investments above the capacity limit for Structured Alpha funds with alpha targets of 500 or greater, and he continued using the materially misleading pitch books with investors.  As a result, investors believed the funds complied with the purported capacity limit when, in fact, they did not.

164.    For example, in November 2019, Tournant permitted an investment in the Allianz SAS fund despite investor pitch books stating that the fund was closed because it had an alpha target of 500.  A "Structured Products biz summary" emailed to Tournant on or around

December 2, 2019 stated, with respect to the potential investment in the Allianz SAS fund,

"*Asked to permit contribution despite fund closure.*"  (Emphasis added.)  Around December 16,

2019, Tournant allowed an investment of more than $100 million.

165.    Similarly, around February 6, 2020, a German prospective investor wanted to

invest in the AllianzGI Structured Alpha 1000 Plus Ltd. fund.  Shortly thereafter, a European

Structured Alpha Products Specialist sent an email, stating "SA 1000 Plus is a private vehicle

that has been closed since Sep 2016 and as such each investor will have to be approved by Greg

[Tournant] . . . ."  Around February 18, 2020, Tournant permitted the investor to invest in the

purportedly closed fund.

166.    At Tournant's direction, Structured Alpha Product Specialists made misleading

statements to investors about why certain investments were permitted in supposedly closed

funds.  Among other things, the Product Specialists told certain Structured Alpha investors (and

certain AGI US personnel) that investments were allowed because of redemptions.  Investors

interpreted such statements to mean that capacity utilization had declined below the capacity

limit, thus allowing new investments while staying under the limit.  In fact, however, the funds

consistently exceeded their purported capacity limits, as illustrated in the graph above.

167.    For example, on May 10, 2019, an AGI US employee told one U.S. institutional

investor by email that "two public plans [were] disinvesting" and "freeing up capacity in these

previously closed products. . . .  We have filled most of the open capacity . . . and currently still

have USD 250M in SA 500 products . . . .  Just wanted to provide you with these latest numbers

as I know you are considering these products."  Other investors and prospective investors for

Structured Alpha received similar messages around the same date.

168.     Tournant approved AGI US telling the institutional investor that the fund had excess capacity.  In fact, as Tournant knew or was reckless in not knowing, AGI US's internal "capacity utilization" spreadsheet for month-end April 2019 showed the "Total SA 500 Capacity Utilized" of $11.686 billion – i.e., $2.686 billion above the $9 billion capacity limit.  Thus, any redemptions did not reduce capacity utilization below the $9 billion limit to permit $250 million in additional investments.

169.     As set forth above, on or around August 30, 2019, a U.S. institutional investor that received materially misleading information from Defendants purchased $330 million of shares in the AllianzGI Structured Alpha U.S. Equity 500 LLC fund.  The investor believed (incorrectly) that it was able to invest because investor redemptions allowed for additional capacity.  In fact, as Tournant knew or was reckless in not knowing, AGI US's internal "capacity utilization" spreadsheet for August 30, 2019 showed the "Total SA 500 Capacity Utilized" of $11.333 billion – well above the $9 billion capacity limit.

### C.     Tournant Manipulated the Multiplier Used to Calculate Capacity Utilization

170.     Besides permitting investments in excess of the purported capacity limit, Tournant manipulated various multipliers that were used to calculate capacity utilization.  By doing so, he concealed the extent to which the funds exceeded their capacity limits.

171.     Regarding the calculation of capacity utilization for the Structured Alpha funds, pitch books represented that AGI US would use a specific multiplier for particular alpha levels. For example, the "Structured Alpha capacity" pitch book slide above stated that the AllianzGI Structured Alpha 500 LLC fund used a "Capacity Multiplier" of 1 times its assets under management, whereas the AllianzGI Structured Alpha 1000 LLC fund used a multiplier of 2.

172.    To reduce the appearance that Structured Alpha funds with alpha targets of 500 and above exceeded their capacity limit, Tournant directed Product Specialists to use an incorrect multiplier of "1" for AllianzGI Structured Alpha Multi-Beta Series LLC I funds for materials sent externally by the portfolio management team.

173.    As Tournant knew, or was reckless in not knowing, using a multiplier of 1 for the AllianzGI Structured Alpha Multi-Beta Series LLC I funds was improper because the actual alpha targets used for those funds exceeded 500, and thus the multiplier should have been greater than 1.  The use of a 1 multiplier also was inconsistent with the internal capacity utilization spreadsheets generated by the portfolio management team, which generally listed multipliers greater than 1 for the AllianzGI Structured Alpha Multi-Beta Series LLC I funds.

174.    On February 9, 2016, Tournant sent an email to an AGI US Product Specialist, with the subject line "Capacity Review" and attaching spreadsheets, including "Structured Alpha Capacity 2.9.16.xlsx."  In that file, Tournant knowingly or recklessly altered the data by calling the Client A fund "Structured Alpha Multi-Beta 500" (rather than "Structured Alpha Multi-Beta 750"), and the "Target" as "Betas + 5% net" (rather than "Betas + 7.5% net").  Tournant also used the improper multiplier of 1, resulting in materially misleading capacity utilization figures for the Structured Alpha funds with alpha targets of 500 and above.

175.    On February 17, 2016, Tournant sent an email to two senior employees at AGI US, with the subject line "***Structured Alpha Capacity Update***".  In that email, Tournant referenced the misleading figures in his manipulated capacity spreadsheet from February 9, 2016, and stated:  "Available capacity as of Feb 1, 2016:  SA 500 [i.e., Structured Alpha funds with alpha targets of 500 and above]: $1.8B . . . .  Important points: . . . Effective Jan 1, 2016, [Client A] downgraded its Alpha target from 750 to 500 across all their funds ($1.5B in total

44

AUM) therefore freeing up $750M of SA500 capacity."  But Tournant's statement was materially false and misleading because AllianzGI Structured Alpha Multi-Beta Series LLC I funds were not reduced to an alpha target of 500; instead, they had a variable alpha target that was consistently higher than 500.

176.    Based on Tournant's instructions, Structured Alpha Product Specialists consistently used the improper "1" multiplier for Structured Alpha Multi-Beta Series LLC funds to calculate capacity utilization, resulting in materially misleading outputs.

177.    Tournant participated in communications with Structured Alpha Product Specialists regarding manipulation of the multiplier for AllianzGI Structured Alpha Multi-Beta Series LLC I funds for purposes of calculating capacity utilization.  Starting no later than July 2019, Product Specialists and Tournant circulated by email among themselves versions of a spreadsheet, "SA 500 replacement assets," that had tabs for both "Team View" and "Firm View" in the same file to calculate capacity utilization.

178.    The "Team View" figures were intended for viewing by the Structured Alpha investment team and used a multiplier of 1.5 for AllianzGI Structured Alpha Multi-Beta Series LLC I funds.  At Tournant's direction, however, the "Firm View" figures were intended for viewing by individuals outside the Structured Alpha investment team and used the improper, materially misleading multiplier of 1 for AllianzGI Structured Alpha Multi-Beta Series LLC I.

## VI.    Defendants Obtained Money Through Their Material Misrepresentations

179.    As set forth above, investors who received materially misleading information from AGI US and Defendants invested billions of dollars in the Structured Alpha funds.  During the Relevant Period, AGI US received more than $550 million in fees for managing the Structured Alpha funds, which resulted in net profits of more than $400 million.

45

180.    Tournant, Taylor, and Bond-Nelson also received millions of dollars for managing the Structured Alpha funds.  Defendants' bonuses from AGI US were tied to their work for the Structured Alpha funds.  As the size and performance of the Structured Alpha funds increased, so did Defendants' bonuses.

181.    From 2016 through 2020, Defendants received the following the following base compensation and bonuses:

| Year | Tournant Base | Tournant Bonus | Taylor Base | Taylor Bonus | Bond-Nelson Base | Bond-Nelson Bonus |
|------|---------------|----------------|-------------|--------------|------------------|-------------------|
| 2016 | $300,000 | $11,857,971 | $300,000 | $11,857,970 | $250,000 | $2,650,000 |
| 2017 | $300,000 | $14,776,007 | $300,000 | $14,776,007 | $250,000 | $3,250,000 |
| 2018 | $300,000 | $9,780,204 | $300,000 | $9,780,204 | $250,000 | $2,150,000 |
| 2019 | $300,000 | $13,403,104 | $300,000 | $13,403,105 | $250,000 | $2,725,000 |
| 2020 | $300,000 | N/A | $300,000 | N/A | $250,000 | N/A |
| **Total** | **$1,500,000** | **$49,817,286** | **$1,500,000** | **$49,817,286** | **$1,250,000** | **$10,775,000** |

182.    Because Defendants committed the violations alleged herein from at least 2016 through 2020, their bonuses received for those years represent ill-gotten gains.

**VII.    Defendants Tried to Conceal Their Misconduct, But the SEC Uncovered the Fraud**

183.    After the Covid-related market drop in March 2020, Defendants engaged in multiple efforts to conceal their misconduct from the SEC.  Those efforts, however, did not succeed.

184.    Before Bond-Nelson was scheduled to provide sworn testimony for the SEC's investigation, on May 20-21, 2021, he had a conversation with Tournant.  In that conversation, Tournant and Bond-Nelson discussed what Bond-Nelson should tell SEC investigators about Defendants' alterations of IDS Risk Reports.  They agreed that Bond-Nelson should testify

falsely that the adjustments reflected the portfolio management team's view of the "volatility curve" and other fabricated explanations.

185.    In Bond-Nelson's testimony before the SEC on May 20-21, 2021, which took place in New York City and Washington, D.C. by video conference, Bond-Nelson lied repeatedly when asked about altered IDS Risk Reports and Greeks.  During Bond-Nelson's second day of testimony, while being questioned about his manipulation of Greeks and confronted with certain documents that he altered, Bond-Nelson took a restroom break and then refused to continue the testimony.  Soon after his testimony, Bond-Nelson decided to cooperate and assist the SEC staff in understanding the Structured Alpha fraud.

186.    After Bond-Nelson's testimony before the SEC, Taylor had a conversation with Tournant at a vacant construction site.  During that conversation, Tournant suggested the false explanation that Defendants' adjustments to IDS Risk Reports and Greeks might not have been material to investors.  Tournant also raised the issue of altered EV sheets and open positions data, and he and Taylor discussed what they would do if anyone located those files.  Tournant advised Taylor to move assets overseas, as he claimed to have done recently.  But after Bond-Nelson's testimony before the SEC, as described above, Taylor also decided to cooperate with the SEC's staff's investigation.

## FIRST CLAIM FOR RELIEF
### Violation of Section 17(a) of the Securities Act
### (Against All Defendants)

187.    Paragraphs 1 through 186 above are re-alleged and incorporated by reference.

188.    Defendants, in the offer or sale of securities, by the use of means or instrumentalities of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:  (1) knowingly or recklessly employed devices, schemes, or artifices

to defraud; (2) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

189.    By their conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF
### Violation of Section 10(b) and of the Exchange Act and Rule 10b-5 Thereunder
### (Against All Defendants)

190.    Paragraphs 1 through 186 above are re-alleged and incorporated by reference.

191.    Defendants, directly or indirectly, in connection with the purchase or sale of securities, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

192.    By their conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violation of Section 10(b) and of the Exchange Act and
### Rule 10b-5 Thereunder
### (Against All Defendants)

193.    Paragraphs 1 through 186 above are re-alleged and incorporated by reference.

194.    As a result of the conduct alleged herein, including the conduct of Defendants while acting as AGI US employees, AGI US violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by directly or indirectly, in connection with the purchase or sale of securities, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:  (a) employing devices, schemes, or artifices to defraud; (b) making untrue statements of a material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

195.    Defendants knew, or were reckless in not knowing, that AGI US violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

196.    By their conduct described above, Defendants knowingly or recklessly provided substantial assistance to AGI US in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

197.    Defendants thus are liable under Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), for aiding and abetting AGI US's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**FOURTH CLAIM FOR RELIEF**
**Violation of Sections 206(1) and (2) of the Advisers Act**
**(Against Tournant)**

198.    Paragraphs 1 through 186 above are re-alleged and incorporated by reference.

199.    At all relevant times herein, Tournant acted as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

200.    Tournant, while acting as an investment adviser, by use of the mails or means and instrumentalities of interstate commerce, directly or indirectly, (1) knowingly or recklessly employed devices, schemes or artifices to defraud a client or prospective client; and (2) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon a client or prospective client.

201.    By his conduct described above, Tournant violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Violation of Sections 206(1) and (2) of the Advisers Act**
**(Against Tournant)**

202.    Paragraphs 1 through 186 above are re-alleged and incorporated by reference.

203.    At all relevant times herein, AGI US acted as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

204.    As a result of the conduct alleged herein, including the conduct of Defendants while acting as AGI US employees, AGI US violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2), by acting as an investment adviser and, by use of the mails or means and instrumentalities of interstate commerce, directly or indirectly, (1) knowingly or recklessly employing devices, schemes or artifices to defraud a client or prospective client; and (2) knowingly, recklessly, or negligently engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon a client or prospective client.

205.    Tournant knew, or was reckless in not knowing, that AGI US violated Sections 206(1) and 206(2) of the Advisers Act.

206.    By his conduct described above, Tournant knowingly or recklessly provided substantial assistance to AGI US in its violations of Sections 206(1) and 206(2) of the Advisers Act.

207.    Tournant thus is liable under Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f), for aiding and abetting AGI US's violations of Sections 206(1) and 206(2) of the Advisers Act.

### SIXTH CLAIM FOR RELIEF
**Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
(Against Tournant)**

208.    Paragraphs 1 through 186 above are re-alleged and incorporated by reference.

209.    At all relevant times herein, Tournant acted as an investment adviser to the Structured Alpha funds, which were pooled investment vehicles within the meaning of Advisers Act Rule 206(4)-8(b), 17 C.F.R. § 275.206(4)-8(b).

210.    Tournant, while acting as an investment adviser to a pooled investment vehicle, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, and knowingly, recklessly, or negligently, (1) made untrue statements of material fact or omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading to investors and prospective investors in a pooled investment vehicle; and (2) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

211.    By his conduct described above, Tournant violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
### (Against All Defendants)

212.    Paragraphs 1 through 186 above are re-alleged and incorporated by reference.

213.    At all relevant times herein, AGI US acted as an investment adviser to the Structured Alpha funds, which were pooled investment vehicles within the meaning of Advisers Act Rule 206(4)-8(b), 17 C.F.R. § 275.206(4)-8(b).

214.    As a result of the conduct alleged herein, including the conduct of Defendants while acting as AGI US employees, AGI US violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8, by acting as an investment adviser to a pooled investment vehicle, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, and knowingly, recklessly, or negligently, (1) making untrue statements of material fact or omitting to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading to investors and prospective investors in a pooled investment vehicle; and (2) engaging in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

215.    Defendants knew, or were reckless in not knowing, that AGI US violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

216.     By their conduct described above, Defendants knowingly or recklessly provided substantial assistance to AGI US in its violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

217.     Defendants thus are liable under Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f), for aiding and abetting AGI US's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

## PRAYER FOR RELIEF

Accordingly, the SEC respectfully requests that the Court grant the following relief:

A.     Find that Defendants committed the violations alleged in this Complaint;

B.     Permanently enjoin Defendants from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2); and Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8;

C.     Permanently prohibit Tournant, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from acting as an officer or director of any issuer that has securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

D.     Order Defendants to disgorge their ill-gotten gains, plus prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(7);

E.     Order Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and/or Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e); and

F.      Grant such further relief as the Court deems appropriate.

**JURY DEMAND**

The SEC demands a trial by jury on all issues so triable.

Dated:  May 17, 2022                    Respectfully submitted,

                                        /s/ Timothy K. Halloran
                                        Timothy K. Halloran (*pro hac vice* to be filed)
                                        Securities and Exchange Commission
                                        100 F Street, NE
                                        Washington, DC 20549
                                        Tel:  202-551-4414
                                        Email:  hallorant@sec.gov

Of Counsel:
Reid A. Muoio (SDNY Bar No. RM-2274)
Jonathan C. Shapiro (SDNY Bar No. JS-5185)
James F. Murtha